UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

LARNELL HENDRICK,
*Prisoner Identification No. 209-362,*

      Plaintiff,

      v.

WEXFORD HEALTH SOURCES, INC.,
FRANK B. BISHOP,
*individually and as Warden of North Branch*
*Correctional Institution,*
LIEUTENANT SAWYERS,
*in his individual and official capacity,*
SERGEANT G. FORNEY,
*in his individual and official capacity,*
CO II SOLTAS,
*in his individual and official capacity,*
CO II ANDERSON,
*individually and in an official capacity,*
BILL BEEMAN,
*individually and as Medical Director of North*
*Branch Correctional Institution,* and
DR. AVA JOUBERT,

      Defendants.

Civil Action No. TDC-14-2544

MEMORANDUM OPINION

Plaintiff Larnell Hendrick has been diagnosed with papilledema and pseudotumor cerebri

and is currently incarcerated at North Branch Correctional Institution ("NBCI") in Cumberland,

Maryland.  He has filed suit under 42 U.S.C. § 1983 (2012), alleging that Defendants Wexford

Health Sources, Inc. ("Wexford"); Bill Beeman, the Medical Director at NBCI; and Ava Joubert,

M.D. (collectively, the "Medical Defendants") and Frank B. Bishop, Warden of NBCI ("Warden

Bishop); Lt. Thomas Sawyers; Sgt. Gregory Forney; CO II Nicholas Soltas; and CO II Chris

Anderson (collectively, the "State Defendants"), violated his rights under the Eighth Amendment to the United States Constitution by reassigning him from a single cell to a double cell in contravention of his medical needs, and in retaliation for filing administrative grievances against correctional officers and for refusing the recommended treatment for his medical condition. Presently pending is the Medical Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment.[1]   The Motion is fully briefed and ripe for disposition.   No hearing is necessary to resolve the issues.  *See* Local Rule 105.6 (D. Md. 2014).   For the reasons that follow, the Motion is GRANTED.

## BACKGROUND

The following facts are presented in the light most favorable to Hendrick, the nonmoving party:

## I.    Diagnosis and Early Treatment

Hendrick is incarcerated at NBCI in Cumberland, Maryland.   On September 9, 2009, Hendrick was diagnosed with papilledema, which causes him to suffer from temporary vision loss.   Hendrick's treating physician, Murtaza Amir, M.D., recommended that Hendrick receive a lumbar puncture, also known as a spinal tap, to relieve the pressure inside Hendrick's skull.   Dr. Amir also recommended that Hendrick begin taking Diamox to treat his symptoms.   On January 21, 2010, a lumbar puncture on Hendrick revealed an elevated intracranial pressure of 38.   On May 5, 2010, following the lumbar puncture, Dr. Amir diagnosed Hendrick with pseudotumor cerebri.   Although pseudotumor cerebri causes increased pressure in the skull and typically manifests itself with headaches, Hendrick denied having any headaches.   Hendrick, however,

---

[1]    On August 6, 2015, the State Defendants filed their own Motion to Dismiss or, in the Alternative, Motion for Summary Judgment.  That Motion will be addressed separately.

continued to complain of vision loss, and Dr. Amir recommended that Hendrick continue to take Diamox.

On July 26, 2010, during a follow-up visit with Dr. Amir, Hendrick stated that, despite taking an increased dosage, his symptoms were not improving with Diamox.   Dr. Amir recommended that Hendrick try another medication, Lasix, and that Hendrick have a ventricular peritoneal ("VP") shunt placed in his brain to relieve the intracranial pressure.   Hendrick declined to switch medications but said that he would consider the VP shunt.

## II.     Placement in a Single Cell

On February 16, 2011, Dr. Evan Lewis, a neurological physician from the University of Maryland Medical Center, evaluated Hendrick.  In addition to vision loss, Hendrick complained to Dr. Lewis about headaches and blurry vision.  Dr. Lewis recommended that Hendrick undergo another lumbar puncture, increase his dosage of Diamox, and consider having a VP shunt implanted.  Fearing that surgery would be fatal, Hendrick declined VP shunt placement.  He also declined to receive another lumbar puncture. He asked Dr. Lewis, however, whether he could be placed in a single cell at NBCI.   Following the evaluation, Dr. Lewis wrote Hendrick a prescription containing only the statement, "Recommend Individual Housing of Prisoner." Defs.' Mem. in Supp. of Defs.' Mot. Dismiss or, in the Alt., Mot. Summ. J. ("Defs.' Mem.") Ex. 1, at 49, ECF No. 27-4.

On February 25, 2011, Hendrick requested a single cell from NBCI medical providers. Upon learning of Dr. Lewis' recommendation, NBCI medical providers granted Hendrick single cell status for one year.  On November 27, 2011, Hendrick's single cell status was renewed for a second year.

On July 31, 2012, Dr. Amir again evaluated Hendrick and found that his intracranial pressure was 23.5. Hendrick reported that he suffered from dizziness and vertigo, and that he sometimes had trouble maintaining his balance. Dr. Amir discussed increasing Hendrick's Diamox dosage and again suggested that Hendrick undergo surgery. Hendrick declined to increase his dosage or to have surgery. On November 21, 2012, Hendrick was approved for a third one-year period of single cell status, which was set to expire on November 21, 2013.

## III.   Renewal of Single Cell and Administrative Grievances

Hendrick alleges that on June 29, 2013, he was assaulted by three NBCI correctional officers during a search of his cell. On July 9, 2013, he filed an Administrative Remedy Procedure ("ARP") grievance against the officers. The grievance, however, was dismissed the following day because the Internal Investigative Unit ("IIU") of the Maryland Department of Public Safety & Correctional Services was investigating the incident. No further action could be taken on the ARP grievance until the IIU completed its investigation.

On January 29, 2014, Hendrick saw Kristi Cortez, R.N., at NBCI and requested that his single cell status be reinstated.[2] Cortez referred the request to another medical care provider. The following day, Quinta Lam, P.A., referred the request to Colin Ottey, M.D., who approved it. On February 4, 2014, Hendrick was granted single cell status for a fourth year, which was scheduled to expire on February 4, 2015.

On April 28, 2014, Hendrick refiled his grievance against the three officers for the alleged assault. On May 2, 2014, the grievance was dismissed because the IIU was still investigating the incident. On May 23, 2014, Hendrick appealed the dismissal to the

---

[2]  The record reflects that, after Hendrick's third year of single cell placement expired in November 2013, he was returned to a cell with more than one bed but placed on "low bunk status." Defs.' Mem. Ex. 1, at 4.

Commissioner of Correction. On June 10, 2014, the Commissioner dismissed the appeal on the grounds that the matter was still under investigation by the IIU and that no action further would be taken. On July 28, 2014, following the dismissal of his appeal, Hendrick filed suit against the officers in federal court. *See Hendrick v. Gordon*, No. DKC-14-2398 (D. Md. filed July 28, 2014). That action is still pending before another judge in this District. *See id.*

## IV.    Hendrick's Return to a Double Cell

According to Hendrick, on July 16, 2014, he was summoned to meet with Medical Director Beeman, Dr. Joubert, and Lt. Sawyers. Unlike for some of his previous medical evaluations, Hendrick had not requested a visit with medical personnel. While Dr. Joubert took his vital signs, Beeman and Lt. Sawyers asked if he would be willing to "sign[] off" on his grievance relating to the alleged physical assault in exchange for maintaining his single cell status. *See* Pl.'s Mem. Law in Support of Pl.'s Opp'n to Defs.' Mot. Dismiss or, in the Alt., Mot. Summ. J. ("Pl.'s Opp'n") 9–10, ECF No. 29-1.[3] Hendrick refused this offer and said he would continue to pursue his grievance. He then was directed to a room across the hall, where he met Beeman, Lt. Sawyers, and Dr. Joubert, as well as others. Beeman then offered to maintain Hendrick's single cell status if he would agree to have surgery to implant the VP shunt. Hendrick declined.

According to the Medical Defendants, the July 16, 2014 meeting was a scheduled provider chronic care visit for Dr. Joubert to evaluate Hendrick's symptoms and included a patient care conference "to discuss medical issues surrounding [Hendrick's] understanding of the

---

[3]    Because Hendrick included a statement "under penalty of perjury" that the contents of his Memorandum in Opposition to the Motion were "true and correct to the best of my knowledge and belief," Pl.'s Opp'n 45, and because the Court construes *pro se* plaintiffs' submissions liberally, the Court deems those portions of the Memorandum that constitute factual statements based on Hendrick's personal knowledge to constitute an affidavit for purposes of the Motion for Summary Judgment.

implications of his refusal of VP shunting / and custody issues surrounding medical necessity for single cell status." Defs.' Mem. Ex. 1, at 10. During the chronic care visit, Hendrick stated that anxiety and claustrophobia were aggravating his symptoms, that he had been suffering from black outs, and that he was experiencing photophopia,[4] worsening vision, and vertigo. At the "multidisciplinary conference" the same day, Dr. Joubert reviewed Hendrick's medical history and discussed the health implications of his refusal to pursue a VP shunt placement. *Id.* at 13. Dr. Joubert concluded that Hendrick was fully competent to refuse surgery and that "there does not appear to be indication to continue single cell status." *Id.* She added that, "in light of his history of 'blacking out' it would be to his benefit to have a cell mate." *Id.* Dr. Joubert also recommended that Hendrick refer himself to Behavioral Health for his anxiety.

Hendrick further alleges that on July 24, 2014, he was moved to a double cell by correctional officers, including Sgt. Gregory Forney, CO II Nicholas Soltas, and CO II Chris Anderson. Sgt. Forney stated that Beeman had given the "green light" to take away Hendrick's single cell and put Hendrick "under attack." Pl.'s Opp'n at 10–11. When Hendrick noted that he had papers signed by Dr. Colin Ottey approving the single cell, Sgt. Forney said that he was aware of that but that he "[did] not care." *Id.* at 11. When Hendrick refused to go to a double cell, the correctional officers moved him to a segregation unit, during which Sgt. Forney told him that he "should not have filed those ARPs." *Id.* at 11. Hendrick alleges that when they arrived at the segregation cell, Soltas, Anderson, and others physically forced him into the cell and slammed his head into the side of the cell wall.

---

[4] "Photophobia" is "eye discomfort in bright light." *See Photophobia*, National Library of Medicine, National Institute of Health (May 7, 2013), https://www.nlm.nih.gov/medlineplus/ency/article/003041.htm.

## V.    Events Following Hendrick's Return to a Double Cell

On July 26, 2014, Hendrick was taken to the medical unit at NBCI after he was found unconscious on the floor of his cell. Hendrick asserts that he blacked out and collapsed in his double cell and regained consciousness in the medical room. Hendrick's medical records indicate that Hendrick had "lowered himself to his cell floor with no injuries." Defs.' Mem. Ex. 1, at 15. According to Hendrick, his cellmate was aggravated by Hendrick's medical condition and told correctional officers that he wanted Hendrick moved out of the cell. On July 29, 2014, Hendrick saw a nurse to request single cell status, at which time he stated that he was on a hunger strike until he was returned to a single cell. Later that day, Hendrick blacked out and collapsed again and was brought to the medical unit for attention. He ended the hunger strike on July 31, 2014.

On August 29, 2014, Hendrick met with a nurse and complained that he was blacking out and was in "extreme fear" of his cellmate, Wayne Boone, which caused him severe anxiety, migraines, and nightmares. Pl.'s Opp'n 15–16. He again requested single cell status. The nurse did not recommend Hendrick for a single cell but told him that Boone would assist him if he had any medical issues. Hendrick responded that Boone was angry that Hendrick was placed in the same cell, especially given that Hendrick had previously soiled himself and had been blacking out and screaming in the middle of the night. The nurse ordered that Hendrick return to his cell.

On September 5, 2014, Hendrick saw another nurse and again requested single cell status. The nurse said that she would "see what she could do," told Hendrick to write to his case manager about the situation, and directed Hendrick to return to his cell. *Id.* at 17. A few days later, Hendrick sent a request to Case Management Manager Richard Roderick requesting a

7

return to a single cell.  Roderick notified Hendrick that he would be placed on a waiting list for a case management-led group on anger management.

Hendrick also identifies several incidents between July 2014 and October 2014 in which prisoners at NBCI allegedly murdered their cellmates and further asserts that from 2011 to 2014, numerous inmates have been found dead in double cells at NBCI.  He also alleges that, on January 26, 2015, he blacked out and began to hallucinate that a bird was flying in his cell.  He awoke later to find that he had assaulted his new cellmate, Adrian Jones, leaving him bloodied. Hendrick was later found guilty of assaulting a fellow prisoner.

## VI.   Procedural History

Hendrick filed this action on August 8, 2014, against Wexford, Warden Bishop, Lt. Sawyers, Sgt. Forney, CO II Soltas, and CO II Chris Anderson.  Construed liberally, the Complaint asserted claims that (1) Defendants violated Hendrick's Eighth and Fourteenth Amendment rights by showing deliberate indifference to a serious medical need by moving him to a double cell; (2) Defendants retaliated against Hendrick, for filing and continuing to pursue an excessive force claim against the officers who allegedly attacked him in June 2013, by moving him to a double cell; and (3) Defendants Soltas and Anderson used excessive force against him when physically relocating him from his single cell.

On October 23, 2014, Hendrick amended the Complaint to include Dr. Joubert as a Defendant.  On February 9, 2015, the Medical Defendants filed the presently pending Motion. On February 27, 2015, Hendrick filed a Response to the Motion.  The Medical Defendants filed their Reply to the Response on March 18, 2015.

On July 10, 2015, the Court granted in part a Motion for Leave to Amend the Complaint to permit additional allegations relating to the impact of living in a double cell on Hendrick and

"numerous murders" of cellmates that have occurred at NBCI.  Order 4, ECF No. 48; Pl.'s Mot. Leave Amend Compl. ¶¶ 21-22, ECF No. 34.  No new legal claims were added.

On September 28, 2015, the Court granted Hendrick's Motion to Amend and/or Supplement, Whichever is Appropriate, in the Interest of Justice, Pursuant to the Complaint, ECF No. 56, seeking to add allegations that Defendants were aware of the recent history of attacks on inmates by their cellmates.  No new legal claims were added.

## DISCUSSION

In their Motion, the Medical Defendants seek dismissal or summary judgment on the grounds that (1) the Complaint fails to state a claim against Wexford because there is no vicarious liability (*respondeat superior*) under 42 U.S.C. § 1983 and (2) Hendrick has failed to demonstrate that the Medical Defendants violated the Eighth Amendment through "deliberate indifference" to a "serious illness or injury." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).

In filing the Motion, the Medical Defendants do not challenge Hendrick's claim that the decision to rescind his single cell status constituted unlawful retaliation in violation of his constitutional rights.  Accordingly, the Court construes the Motion as a motion for partial summary judgment.  For the reasons set forth below, the Court grants the motion for partial summary judgment as to the two issues addressed in the Motion.[5]

---

[5] On August 26, 2015, Hendrick filed a Motion to Amend Plaintiff's Complaint in the Interest of Justice, ECF No. 55, in which he clarified that his claim for retaliation is based on the theory that he was moved to a double cell in retaliation for having filed grievances relating to the June 29, 2013 alleged assault, in violation of his First Amendment "right to petition for grievances." *Id.* at 3.  He also asserted a claim under the Eighth Amendment that his forced move to a double cell constituted a failure to provide "reasonable safety," in violation of the Eighth Amendment. *Id.*  The Court will rule on that Motion to Amend separately.  Because the original Complaint clearly stated a retaliation claim that was not addressed here, the Court need not rule on that motion to conclude that the Medical Defendants' Motion effectively seeks only partial summary judgment.

I.      **Wexford's Motion to Dismiss**

Wexford's claim that the Complaint fails to state a claim against it because there is no *respondeat superior* liability under 42 U.S.C. § 1983 is properly construed as a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the Court grants the Motion.

A.      **Legal Standard**

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005). *Pro se* complaints must be liberally construed and are held to a less stringent standard than documents drafted by attorneys. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

B.      **Vicarious Liability**

Hendrick has asserted that Wexford is liable because it "is the entity who govern[s] the NBCI Medical Dept and [they are] liable in this case . . . for the malicious actions of NBCI Medical Director Bill Beeman," Compl. 7, and it is a "private entity" that "had or should have had knowledge of this continual deliberate action committed against Plaintiff by its medical agents." Pl.'s Opp'n 29. Wexford argues that Hendrick has failed to state a claim against Wexford because Hendrick's claim is that Wexford is liable for the actions of its employees

10

under a theory of vicarious liability (*respondeat superior*), but there is no such liability available under 42 U.S.C § 1983.  Wexford is correct.

Section 1983 allows individuals to sue in federal court any person who violates their federally protected rights while acting under the color of law.  42 U.S.C. § 1983 (2012).  The Supreme Court, in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), concluded that local government entities are considered "persons" for the purposes of § 1983, but they cannot be held liable solely because they employ an individual who committed an unlawful act.  *Id.* at 690–91.  Rather, local governments can only be sued if the constitutional violation alleged results from a custom or policy of the local government.  *Id.*  This standard also applies to private companies that employ individuals acting under color of state law, such as special police officers, who allegedly commit unlawful acts.  *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999) (citations omitted).  Such companies are liable under § 1983 "*only* when an official policy or custom of the corporation causes the alleged deprivation of federal rights."  *Id.* (emphasis in original).

Here, the case centers on the decision by Wexford personnel to return Hendrick to a double cell.  Hendrick alleges no specific conduct by Wexford, and he does not allege a custom or policy of Wexford that resulted in a deprivation of his constitutional rights.  Hendrick, in essence, seeks to hold Wexford liable because it employed the individuals who made the decision, which is insufficient to establish liability against a private company under § 1983.  *See Powell v. Shopco Laurel Co.*, 678 F.2d 504, 505–06 (4th Cir. 1982) (dismissing a claim against the private employer of a security guard under § 1983).  Accordingly, Wexford's Motion to Dismiss is granted, and the claims against Wexford are dismissed.

## II.     Eighth Amendment Claim on Inadequate Medical Care

The Medical Defendants seek dismissal of, or summary judgment on, Hendrick's claim
that the decision to return him to a double cell constituted "deliberate indifference" to a serious
medical need and thereby violated his Eight Amendment rights.  Because both parties have
submitted evidence for the Court's review, the Motion is construed as a motion for summary
judgment for purposes of Hendrick's Eighth Amendment claim. *See* Fed. R. Civ. P. 12(d).

### A.     Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the
moving party demonstrates that there is no genuine issue as to any material fact, and that the
moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v.
Catrett*, 477 U.S. 317, 322 (1986).  In assessing the Motion, the Court views the facts in the light
most favorable to the nonmoving party, with all justifiable inferences drawn in its favor.
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The Court may rely only on facts
supported in the record, not simply assertions in the pleadings.  *Felty v. Grave–Humphreys Co.*,
818 F.2d 1126, 1128 (4th Cir. 1987).  The nonmoving party has the burden to show a genuine
dispute on a material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,
586–87 (1986).  "A material fact is one that might affect the outcome of the suit under the
governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting
*Anderson*, 477 U.S. at 248) (internal quotation marks omitted).  A dispute of material fact is only
"genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return
a verdict for that party. *Anderson*, 477 U.S. at 248–49.

12

## B.   "Deliberate Indifference"

The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend. VIII. A prison official violates the Eighth Amendment when the official shows "deliberate indifference to serious medical needs of prisoners." *Estelle*, 429 U.S. at 104; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). To be "serious," the condition must be "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Jackson*, 775 F.3d at 178 (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)) (internal quotation marks omitted); *see also Russell v. Sheffer*, 528 F.2d 318, 318 (4th Cir. 1975) (per curiam) ("Questions of medical judgment are not subject to judicial review."). "An official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson*, 775 F.3d at 178 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)) (internal quotation marks omitted). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* (citations omitted). Thus, a deliberate indifference claim has both an objective component—that there objectively exists a serious medical condition and an excessive risk to the inmate's health and safety—and a subjective component—that the official subjectively knew of the condition and risk. *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1978) (holding that an official must have "knowledge" of a risk of harm, which must be an "objectively, sufficiently serious").

Deliberate indifference is an "exacting standard" that requires more than a showing of "mere negligence or even civil recklessness, and as a consequence, many acts or omissions that

13

would constitute medical malpractice will not rise to the level of deliberate indifference." *Jackson*, 775 F.3d at 178; *Rich v. Bruce*, 129 F.3d 336, 339 (4th Cir. 1997) (finding that even when prison authorities are "too stupid" to realize the excessive risk their actions cause, there is no deliberate indifference).  To constitute deliberate indifference to a serious medical need, the defendant's actions "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990).

The Medical Defendants do not dispute that Hendrick's medical condition is serious. Hendrick suffers from papilledema and pseudotumor cerebri, which have resulted in, at various times, temporary vision loss, dizziness, blackouts, and hallucinations.  Hendrick's condition was initially diagnosed in 2009, and physicians have repeatedly urged Hendrick to seek more intensive treatment for his condition, including surgery to implant a VP shunt.  They deny, however, that they acted with "deliberate indifference" to Hendrick's serious medical needs. *See Estelle*, 429 U.S. at 104.

Given that Hendrick's care has included numerous examinations and tests, prescriptions for different medications in varying doses, and recommendations for surgical procedures, it would be difficult to argue that the Medical Defendants' treatment exhibited "deliberate indifference" to his needs.[6]  Despite his repeated medical treatment, Hendrick nevertheless argues that the Medical Defendants acted with deliberate indifference by removing his single cell status.  In support of his argument, Hendrick asserts that (1) he needs a single cell because of the

---

[6] In his memorandum in opposition to the Motion, Hendrick asserts that the Medical Defendants denied him access to adequate medical care despite the recommendation of a specialist, in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq*. (2012).  The Court already rejected Hendrick's ADA claim in its July 10, 2015 Order.  ECF No. 48.

risk that a cellmate will take advantage of his condition and assault him, such as if he blacks out or experiences vison loss; (2) a doctor in 2009 recommended that he be placed in a single cell, and he was generally housed in a single cell from that time forward until July 2014; (3) as late as February 2014, Dr. Colin Ottey at NBCI renewed his single cell status for one year; (4) once he was placed in a double cell, he did, in fact, lose consciousness in his cell on several occasions, and two different cellmates have complained about his presence in the cell because of his medical issues; (5) on one occasion on January 26, 2015, he apparently assaulted his cellmate while hallucinating, but has no memory of the incident; and (6) on other occasions other incarcerated individuals at NBCI were allegedly assaulted or killed by cellmates.

These facts are insufficient to establish "deliberate indifference" arising from the decision to return Hendrick to a double cell. Placing an inmate in a cell with another inmate generally does not violate the Eighth Amendment. *See Rhodes v. Chapman*, 452 U.S. 337, 347–50 (1981). To show deliberate indifference, Hendrick must establish that (1) there objectively was an excessive risk to inmate health and safety based on his placement in a double cell and (2) the Medical Defendants actually knew of that risk and disregarded it. *See Farmer*, 511 U.S. at 834, 837. Hendrick's evidence is insufficient to establish the objective component of the test, that there is an excessive risk to inmate health and safety.

The Medical Defendants have provided an affidavit by Dr. Ottey, the Medical Director of NBCI, who has treated Hendrick, in which Dr. Ottey states "with a reasonable degree of medical probability" that "the decision to house Plaintiff in a double cell was medically appropriate and within the standard of care. Having a cellmate . . . makes Plaintiff safer because the cellmate can notify correctional staff if/when Plaintiff should ever lose consciousness or require immediate medical attention." Defs.' Mem. Ex. 2 ¶ 22. This conclusion is consistent with Dr. Joubert's

finding after the July 16, 2014 meeting that "there does not appear to be indication to continue single cell status . . . in light of [Hendrick's] history of 'blacking out' it would be to his benefit to have a cell mate." Defs.' Mem. Ex. 1, at 13. Although Hendrick disagrees with this conclusion, a disagreement between an inmate and a physician over proper medical care is not sufficient to show deliberate indifference. *See Jackson*, 775 F.3d at 178 (quoting *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)); *Russell*, 528 F.2d at 319.

Hendrick has asserted that the earlier decisions to approve single cell status contradict this conclusion and establish that failure to provide a single cell constitutes "deliberate indifference" to a serious medical need. A review of the medical records reveals that Hendrick had been approved for a single cell from 2011 to November 2013, then had that status reinstated for the period from February 2014 to February 2015. The medical records, however, do not indicate that single cell status was an absolute medical necessity. The original approval in February 2011 was based on a February 16, 2011 recommendation by Dr. Lewis of the University of Maryland Neurosurgery Associates, written on a prescription form, stating "Recommend Individual Housing of Prisoner," without explanation. Defs.' Mem. Ex. 1, at 49. The medical notes of a February 25, 2011 examination state that although Hendrick asked for a single cell because he did not trust other inmates, "Patient was advised again that the[re] is currently no medical indication for single cell status," and that he "currently demonstrates no neurologic [symptoms] that would necessitate placement in a single cell and was previously told that a cellmate would be able to notify staff if his condition declines." *Id.* at 1. The same day, Dr. Summerfield, having reviewed Dr. Lewis's recommendation, indicated that he was "in [f]avor of a single cell" for Hendrick. *Id.* at 3. Another doctor, Dr. Getachew reportedly was "comfortable going w/ the Ophthalmologist's & Neurologist's suggestion," so an order was

issued for single cell status for one year "for condition that may result in blindness." *Id.* The subsequent records indicate that Hendrick lost his single cell status from November to January 2013, then requested renewal of his single cell status because of his "papilledema diagnosis" and "claustrophobia." *Id.* at 4–6. When his status was reinstated in February 2015 by Dr. Ottey, no specific reason for the renewal was provided.

The medical records relating to the original decision, which predate the June 2013 alleged attack on Hendrick, therefore show some disagreement among medical professionals on the need for a single cell, and that the final decision to approve the single cell was based on a "suggestion." *Id.* at 3. The records further indicate that Hendrick's single cell status was not maintained continuously, and that no doctor had articulated reasons for the single cell status that indicate "an excessive risk to inmate health or safety" arising from a double cell. *Jackson*, 775 F.3d at 178. Significantly, the records reveal that Dr. Joubert's rationale for a double cell in 2014, that Hendrick would have a cellmate who could raise the alarm if Hendrick blacked out or had other medical issues, was first raised in the 2011 discussions on whether Hendrick should be granted the single cell.

At most, therefore, Hendrick can show that the decision to place him in a double cell differed with his view and the views of other medical professionals. However, the fact that medical professionals may differ on a recommended course of treatment does not establish deliberate indifference. *See id.* at 178. In *Jackson*, the Fourth Circuit found no deliberate indifference when a general practitioner failed to diagnose a serious heart condition and altered the treatment plan, even though a cardiologist had previously diagnosed the condition and treated him for it. *Id.* Even though the second doctor's approach "might support a medical malpractice claim" and "may have been mistaken, even gravely so," the court concluded that the claim was

17

essentially a disagreement between an inmate and a physician over the inmate's proper care. *Id.* The Fourth Circuit has consistently found such disagreements "to fall short of showing deliberate indifference." *Id.* Where the medical records show that there was no uniformity among the medical professionals on whether an inmate with Hendrick's condition required a single cell for medical reasons and no clear evidence that failing to provide a single cell would pose an excessive risk to Hendrick's health and safety, he cannot show deliberate indifference to a serious medical need.

Hendrick further argues that his experience in a double cell provides additional evidence supporting a showing of an excessive risk to his health and safety. Viewing this evidence in the light most favorable to Hendrick, however, the Court finds that it falls short. Hendrick has asserted that since the July 2014 decision to move him to a double cell, he blacked out twice in his cell and has engaged in other behavior resulting from his condition, such as screaming in the middle of the night, soiling himself, and hallucinating. He has expressed fear and anxiety over the possibility that a cellmate could attack him. According to Hendrick, two different cellmates were angry that they had to share a cell with Hendrick and asked that he be moved. He has not provided any evidence, however, that either of these cellmates threatened him or caused him any harm. Nor has he shown that during his earlier time period in a double cell, from November 2013 to February 2014, any cellmates threatened or attacked him. To the contrary, the only violent episode that Hendrick asserts involved him assaulting his cellmate while hallucinating about a bird flying in his cell.

Otherwise, the only evidence Hendrick has offered to show the excessive risk to his safety consists of his multiple references to incidents, unrelated to him or to inmates with his medical condition, in which inmates have assaulted or killed their cellmates at NBCI. Because

18

none of those examples involved cellmates with the same or similar medical condition as Hendrick, this evidence is of little probative value. In the end, therefore, Hendrick relies primarily on his subjective concerns for his safety, which are insufficient to prove the excessive risk to his health and safety necessary to establish a deliberate indifference claim based on the decision to move him to a double cell. *See Rhodes*, 452 U.S. at 347–49 (analyzing the objective state of the prison, rather than the subjective impressions of prisoners, in finding double cells do not violate the Eight Amendment's Cruel and Unusual Punishment Clause); *Williams v. Bishop*, No. RWT-12-1616, 2014 WL 4662427, at *6 (D. Md. Sept. 16, 2014) ("A prisoner's strong desire to be in a single cell, based on his belief that his medical conditions cause difficulties with cellmates, does not entitle him to housing in a single cell unless medical providers have made a directive for a single cell based on a medical need."); *cf. Wolff v. Hatcher*, 936 F.2d 581, No. 90-16304, 1991 WL 113213, at *1 (9th Cir. June 24, 1991) (denying claim that defendant convicted of child molestation offenses had a constitutional right to a single cell to avoid abuse by other prisoners).

Based on this record, Hendrick has not demonstrated that the decision to place him in a double cell poses an "excessive risk to inmate health or safety," *Jackson*, 775 F.3d at 178, or that the decision to do so was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness," *Miltier*, 896 F.2d at 851. Accordingly, the Medical Defendants are entitled to summary judgment on Hendrick's Eight Amendment claim based on deliberate indifference to serious medical need.

## CONCLUSION

For the foregoing reasons, the Motion, construed as a Motion for Partial Summary Judgment, is GRANTED. All claims against Wexford are DISMISSED. The claim against the remaining Medical Defendants for an Eight Amendment violation, based on the theory that placement of Hendrick in a double cell constitutes deliberate indifference to a serious medical need, is DISMISSED. A separate Order follows.

Date: September 29, 2015

THEODORE D. CHUANG
United States District Judge