## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

LARNELL HENDRICK,
*Prisoner Identification No. 209-362,*

      Plaintiff,

      v.

FRANK B. BISHOP,
*individually and as Warden of North Branch
Correctional Institution,*
LIEUTENANT SAWYERS,
*in his individual and official capacity,*
SERGEANT G. FORNEY,
*in his individual and official capacity,*
CO II SOLTAS,
*in his individual and official capacity,*
CO II ANDERSON,
*individually and in an official capacity,*
BILL BEEMAN,
*individually and as Medical Director of North
Branch Correctional Institution,* and
DR. AVA JOUBERT,

      Defendants.

Civil Action No. TDC-14-2544

## MEMORANDUM OPINION

Plaintiff Larnell Hendrick, an inmate at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland, has filed suit under 42 U.S.C. § 1983 against Defendants Frank B. Bishop, Warden of NBCI ("Warden Bishop"); Lt. Thomas Sawyers; Sgt. Gregory Forney; CO II Nicholas Soltas; and CO II Chris Anderson (collectively, the "State Defendants"), as well as Bill Beeman, the Medical Director at NBCI; and Dr. Ava Joubert, a physician at NBCI (collectively, the "Medical Defendants"). Hendrick alleges that Defendants violated his constitutional rights by (1) participating in his reassignment from a single cell to a double cell in contravention of his

medical and safety needs; and (2) reassigning him in retaliation for filing administrative grievances against correctional officers he had previously accused of excessive force and for refusing to withdraw those complaints. Hendrick also alleges that the State Defendants violated his constitutional rights by using excessive force against him in moving him to the double cell.

Presently pending before the Court is the State Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, ECF No. 50; the Medical Defendants' Motion for Summary Judgment on Hendrick's Retaliation Claims, ECF No. 66, and Hendrick's Motion to Strike the Medical Defendants' Motion for Summary Judgment, ECF No. 71. The matter is ready for disposition, and a hearing is not necessary. *See* D. Md. Local R. 105.6. For the reasons that follow, Hendrick's Motion to Strike is DENIED, the State Defendants' Motion is GRANTED IN PART and DENIED IN PART; and the Medical Defendants' Motion for Summary Judgment is DENIED.

## BACKGROUND

This is not the first time that the Court has addressed Hendrick's claims. On September 29, 2015, the Court issued a Memorandum Opinion on the Medical Defendants' Motion for Partial Summary Judgment. *See Hendrick v. Wexford Health Sources, Inc.* (*"Hendrick I"*), No. TDC-14-2544, 2015 WL 5766320 (D. Md. Sept. 29, 2015). The facts and procedural history of this case are set forth in detail in that Opinion, which is incorporated herein by reference. *See id.* Additional facts are referenced below as necessary as they relate to the analysis of the specific Motions.

## DISCUSSION

**I.     Motion to Strike the Medical Defendants' Motion for Summary Judgment**

Hendrick asks the Court to strike the Medical Defendants' Motion for Summary Judgment on the retaliation claim because the Medical Defendants failed to assert that argument in its prior Motion for Summary Judgment. The Motion is denied because a motion for summary judgment may be filed at any time until 30 days after the close of all discovery. Fed. R. Civ. P. 56(b). Discovery has not begun, let alone close, so there is no basis for striking the motion. The Motion to Strike is denied.

**II.    Motions for Summary Judgment**

The State Defendants seek dismissal or summary judgment on the grounds that Hendrick has failed to exhaust administrative remedies; that Hendrick has not established that his placement in a double cell violates the Eighth Amendment, that the State Defendants used excessive force against him, or that Defendants retaliated against him for exercising his First Amendment rights; and that they are entitled to qualified immunity. The Medical Defendants seek summary judgment on the grounds that Hendrick has not established a viable claim for retaliation against them.

### A.     Legal Standard

Because Defendants have attached documents and declarations to their Motion, and consideration of those documents is necessary to evaluate their arguments, the Motion will be construed as a Motion for Summary Judgment. *See* Fed. R. Civ. P. 12(d) (stating that if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56"). Where Hendrick has not requested discovery but has instead responded to the Motions by attaching his own declarations and exhibits, the Court

3

may properly consider summary judgment. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996).

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Felty v. Grave–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248) (internal quotation marks omitted). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

### B.    Eighth Amendment Claims Regarding Placement in a Double Cell

The State Defendants seek summary judgment on Hendrick's claims that his placement in a double cell violated the Eighth Amendment because that placement exhibited deliberate indifference to a serious medical need and deprived him of "reasonable safety." Pl.'s Mot. Amend Pl.'s Compl. ¶ II, ECF No. 55. Since the filing of the State Defendants' Motion, the Court addressed these issues in granting summary judgment in favor of the Medical Defendants

4

in its Memorandum Opinion of September 29, 2015. *See Hendrick I*, 2015 WL 5766320, at *6–9. In that Opinion, the Court concluded, based on the same evidence Hendrick presented on this Motion, that Hendrick's placement in a double cell did not constitute "deliberate indifference" to a serious medical need, *id.* at *7–8.[1] For the reasons stated in that Opinion, the Court grants summary judgment in favor of the State Defendants on this claim.

To the extent that Hendrick's claim that placement in a double cell deprived him of reasonable safety could be construed as asserting a separate Eighth Amendment claim, that argument is also foreclosed by the Court's earlier Opinion. The Court specifically concluded, on the same evidence offered by Hendrick, that Hendrick's placement in double cell did not cause an excessive risk to his safety. *Id.* at *9. Based on the same analysis, the Court grants summary judgment in favor of the State Defendants on this claim.

### C.    Exhaustion of Administrative Remedies

On the remaining claims relating to excessive force and retaliation, the State Defendants assert that Hendrick's claims must be dismissed because he failed to exhaust administrative remedies. The Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e (2012), provides that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a); *see also Moore v. Bennette*, 517 F.3d 717, 725–26 (4th Cir. 2008) (holding that a court may dismiss a claim if the plaintiff "was afforded an opportunity to respond to the defendant['s] contentions that he had failed to exhaust his administrative remedies" as required

---

[1]    The Court reached the same conclusion based on the same facts in a related case. *See Hendrick v. Booth*, No. TDC-14-4021, 2015 WL 8055172 at *8 (D. Md. Dec. 3, 2015).

by the PLRA). This exhaustion requirement mandates "proper exhaustion," by which inmates must complete the administrative review process, including meeting procedural requirements and applicable deadlines, before filing a claim in federal court. *See Woodford v. Ngo*, 548 U.S. 81, 93 (2006). Courts have no discretion to dispense with the exhaustion requirement in lawsuits where the PLRA applies. *See id.* at 85.

To exhaust administrative remedies, inmates in Maryland correctional facilities are generally required to follow the Administrative Remedy Procedure ("ARP"), as detailed in Division of Correction Directive No. 185-002 (2008) ("DCD 185-002"). *See Blake v. Ross*, 787 F.3d 693, 697 (4th Cir. 2015). The first step in this process is to file a request for administrative remedy with the Warden, commonly referred to as an ARP. If this request is denied, the prisoner must file, within 30 days, an appeal to the Commissioner of Correction. If this appeal is denied, the prisoner has thirty days to file an appeal to the Executive Director of the Inmate Grievance Office ("IGO"). *See* Md. Code Ann., Corr. Servs. §§ 10-206, 10-210 (2002); Md. Code Regs. 12.07.01.05 (2016); *see also* DCD 185–002 § VI.N.1.

The State Defendants argue that Hendrick's excessive force and retaliation claims should be dismissed because Hendrick did not file an ARP alleging those claims. Hendrick explains this failure by stating that when he asked to file to an ARP, prison officials told him he could not do so because his allegations were being investigated by the Internal Investigative Unit ("IIU"), which investigates allegations of excessive force and other matters. Md. Code Regs. 12.11.01.05(A)(3). The United States Court of Appeals for the Fourth Circuit has held that if an inmate raises a claim that is investigated through the IIU process, the claim can be exhausted without the filing of an ARP. *See Blake*, 787 F.3d at 699–701. The court reasoned that the IIU process substantively exhausts remedies because it provides corrections officials the time and

opportunity to address complaints internally, and it procedurally exhausts remedies because an inmate is justified in believing that the IIU investigation would meet the exhaustion requirement since "there is no basis for an inmate to conclude that the ARP and IIU processes would be permitted to proceed concurrently." *See id.* at 698–99.

Here, Hendrick complained to prison officials, orally and in writing, that on July 24, 2014, he was subjected to excessive force and retaliation when he was removed from his single cell and forced into a double cell by Sgt. Forney, CO Anderson, CO Soltas. In a letter to prison officials, Hendrik reported that during the move, he was assaulted in that he was physically thrown into the cell, he was grabbed by the neck, and his head was slammed against the cell wall. He further alleged that Sgt. Forney told him "I shouldn't have filed ARP grievances against his officers and that I'm going into a double cell," indicating that the removal and assault were motivated by a desire to retaliate against Hendrick for alleging excessive force against other correctional officers in 2013. State Defs.' Notice Certifying IIU Records Have Been Sent to Pl. ("Notice"), Hendrick Letter at 16–18, ECF No. 75-1.[2] Based on this letter, the IIU conducted an investigation which included reviewing Hendrick's medical records and interviewing the officers, an inmate witness, and Hendrick.

Because Hendrick alleged that the forcible move on July 24, 2014 constituted both excessive force and retaliation, the IIU investigation provided corrections officials the time and opportunity to address the complaints internally. *See Blake*, 787 F.3d at 698–99. Moreover, Hendrick was justified in believing that his complaints procedurally exhausted his administrative remedies, as he attempted to file an ARP on the matter but was told that because it involved use

---

[2]   Citations are to the page numbers in the original documents. When exhibits do not have page numbers, or contain multiple sets of page numbers, citations are to the page numbers assigned by the Court's Case Management/Electronic Case Files system.

of force, the IIU was going to investigate and his ARP would not be processed. Moreover, as noted in *Blake*, materials available to inmates in the Maryland correctional system can lead inmates to reasonably believe that they cannot file ARP requests while an IIU investigation is underway. *See Blake*, 787 F.3d at 698–99. Therefore, the Court concludes that Hendrick properly exhausted his excessive force and retaliation claims. *See id.* at 700–01.

**D.    Excessive Force**

Hendrick claims that the State Defendants acted with excessive force when Officers Anderson and Soltas moved him to the double cell. The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. This prohibition "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The Eighth Amendment is violated when an inmate is subjected to "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). To establish an Eighth Amendment violation, an inmate must establish both that the prison official subjectively "acted with a sufficiently culpable state of mind" and that the injury or deprivation inflicted was objectively serious enough to constitute a violation. *Williams*, 77 F.3d at 761. On the subjective element, an inmate must show that the guards used force "maliciously or sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). As for the objective level of harm, although the Eighth Amendment does not prohibit *de minimis* use of physical force, "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *See Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010). "When prison officials

8

maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson*, 503 U.S. at 9. The extent to which injuries are modest is accounted for in the award of damages. *See Wilkins*, 559 U.S. at 40.

In a declaration, Hendrick stated that on July 24, 2014, Sgt. Forney, CO Anderson, and CO Soltas arrived to transport him from a single cell to a double cell. According to Hendrick, Sgt. Forney told him that Beeman and Lt. Sawyers had given the "green light" to put him "under attack." Pl.'s Resp. Opp'n State Defs.' Mot. Dismiss or in the Alternative Mot. Summ. J. ("Pl.'s Resp. State Defs.' Mot.") Ex. 4, Hendrick Decl. ¶¶ 15–16, ECF No. 53-5. As CO Anderson and CO Soltas moved him to a double cell, they pushed and shoved him, choked him, punched him with a closed fist in his head and body. When they arrived at the cell, the officers slammed his head into the wall causing him to lose consciousness. According to Hendrick, he suffered bruises on his face, checks, and throat.

Hendrick also filed a declaration from a fellow inmate, Leonard Lee Haley, who claims he witnessed the event. According to Haley, he observed several correctional officers "forcibly bring" Hendrick to the double cell before "shoving" him in. Pl.'s Resp. State Defs.' Mot. Ex. 2, Haley Decl. ¶ 2, ECF No. 53-2. Once inside the cell, and while Hendrick was handcuffed, CO Soltas began choking Hendrick with two hands around his neck while CO Anderson punched Hendrick in the jaw, neck, and head. Another officer also punched Hendrick in the face, chest, back, and side. COs Anderson and Soltas then pushed Hendrick's head several times into the cell wall until Hendrick screamed out in pain and collapsed. Afterwards, COs Anderson and Soltas laughed and hugged one another.

The officers' accounts of transporting Hendrick to the double cell are completely different from those of Hendrick and Haley. In separate declarations, CO Anderson and CO

Soltas both attest that they moved Hendrick to his new cell without incident and deny threatening, hitting, or choking Hendrick or slamming his head against the cell wall. They also point to the fact that Hendrick was seen by medical professionals three times in the week following the alleged assault, in part because he went on a hunger strike to protest his loss of a single cell, but there is no indication of an injury in his medical records. In fact, on July 26, 2014, two days after the alleged assault, Hendrick made an unscheduled visit to the medical clinic when he was found on the floor of his cell passed out, and the attending nurse did not note any injuries.

Where the parties offer differing accounts of the incident in their declarations, the Court cannot weigh the evidence or make credibility determinations on a motion for summary judgment, but instead must view the evidence in the light most favorable to the nonmoving party. *See Anderson*, 477 U.S. at 255. Hendrick's account of the cell transfer, which involved shoving, punching, choking, and slamming his head into the cell wall, would establish unnecessary and wanton infliction of pain. This account was corroborated by the declaration of another inmate. While the absence of any reported injury in the medical records in the days following the alleged assault tends to counter Hendrick's claims, it does not bar the claim from going forward because serious injury is not required. *See Wilkins*, 559 U.S. at 38. If true, this account would allow a reasonable jury to conclude that the State Defendants used excessive force against Hendrick. *See Hudson*, 503 U.S. at 9. Because Hendrick has established a genuine issue of material fact on whether he was subjected to excessive force, the Court denies the motion for summary judgment on that claim.

### E.      Retaliation

To establish a retaliation claim against prison officials, an inmate must show that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right. *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). Here, Hendrick asserts a claim for unlawful retaliation against him for exercising his First Amendment rights. Specifically, Hendrick claims that Defendants decided to move him from a single cell to a double cell, and to assault him in the process, because he had filed an excessive force claim against correctional officers and refused to withdraw that grievance.

In support of this claim, Hendrick asserts that dating back to 2011, medical professionals had authorized him to be in a single cell because of his diagnosed papilledema and pseudotumor cerebri, which sometimes cause him to black out or experience vision loss. On February 4, 2014, Dr. Colin Ottey extended his single cell status for another year until February 2015.

The previous year, on July 9, 2013, Hendrick had filed an ARP against correctional officers he alleges assaulted him during a search of his cell on June 29, 2013. The grievance, however, was dismissed the following day because the IIU was investigating the incident. On April 28, 2014, Hendrick refiled his ARP against the three officers but it was dismissed again because the IIU investigation was still ongoing. On May 23, 2014, Hendrick appealed the dismissal to the Commissioner of Correction, who denied the appeal on June 10, 2014 because of the pending IIU investigation.[3]

---

[3]      On July 28, 2014, following the dismissal of his appeal, Hendrick filed suit against the officers in federal court. *See Hendrick v. Gordon*, No. DKC-14-2398 (D. Md. filed July 28, 2014). On August 27, 2015, the Court (Chasanow, J.) denied the defendants' motion for summary judgment. *See Hendrick v. Gordon*, No. DKC-14-2398, 2015 WL 5091913 at *9 (D. Md. Aug. 27, 2015). That case remains pending.

On July 16, 2014, Hendrick was summoned to meet with Medical Director Beeman, Dr. Joubert, and Lt. Sawyers. While Dr. Joubert took his vital signs, Beeman and Lt. Sawyers asked if he would be willing to "sign off" on his grievance relating to the alleged physical assault in exchange for maintaining his single cell status. *See* Hendrick Decl. ¶ 11. Hendrick refused this offer and said he would continue to pursue his grievance. He then was directed to a room across the hall, where he met with Beeman, Lt. Sawyers, and Dr. Joubert, as well as others. Beeman then offered to maintain Hendrick's single cell status if he would agree to have surgery to address his condition. Hendrick declined.

According to the Medical Defendants, the July 16, 2014 meeting was a scheduled chronic care visit for Dr. Joubert to evaluate Hendrick's symptoms and included a patient care conference to discuss medical issues relating to his refusal to undergo surgery and the medical necessity for single cell status. At the conference, Dr. Joubert concluded that "there does not appear to be indication to continue single cell status" and that Hendrick would benefit from having a cellmate in the event he blacked out and needed assistance. State Defs.' Mot. Ex. 1, Medical Records at 25, ECF No. 50-2.

Then on July 24, 2014, Hendrick was moved to a double cell by correctional officers, including Sgt. Forney, CO Soltas, and CO Anderson. According to Hendrick, Sgt. Forney stated that Beeman had given the "green light" to take away Hendrick's single cell and put Hendrick "under attack." Hendrick Decl. ¶¶ 15-16. When Hendrick refused to go to a double cell, the correctional officers moved him to a segregation unit, where Sgt. Forney told him that he "should not have filed grievances against his officers." *Id.* ¶ 15. Hendrick alleges that when they arrived at the segregation cell, CO Soltas, CO Anderson, and others physically forced him into the cell, beat him, and slammed his head into the side of the cell wall.

### 1.   Protected First Amendment Activity

"The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). To state a retaliation claim for exercising First Amendment rights, a plaintiff must show that (1) the plaintiff engaged in protected First Amendment activity; (2) the defendants took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendants' conduct. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).

The Fourth Circuit has not addressed in a published opinion whether inmates have a First Amendment right to be free from retaliation for filing grievances relating to misconduct by prison officials. In *Adams v. Rice*, 40 F.3d 72 (4th Cir. 1994), the court stated that "there is no constitutional right to participate in grievance proceedings," but it did so in the context of rejecting an inmate's claim that the Eighth Amendment provides a "right to inform" prison officials of dangerous conditions, and that the inmate was subjected to retaliation for exercising that "right" by seeking protective custody. *Id.* at 75. In *ACLU v. Wicomico County*, 999 F.2d 780 (4th Cir. 1993), the Fourth Circuit found a First Amendment right in the prison context, but the right asserted was that of the ACLU to be free from retaliation by prison officials as a result of its filing of an employment discrimination lawsuit on behalf of a prison employee, not a prisoner's right to file a grievance without retaliation. *Id.* at 785.

In an unpublished opinion, however, the Fourth Circuit indicated that an inmate's claim that she had lost visitation privileges in retaliation for filing grievances "could state a constitutional claim." *Wright v. Vitale*, No. 91-7539, 1991 WL 127597, at *1 (4th Cir. July 16,

13

1991). In another unpublished opinion, the court stated that an inmate's First Amendment rights were implicated by his "claim that he is being transferred [to another prison] because prison officials are retaliating for [his] numerous institutional grievances," but concluded that he did not state a claim because the prison had legitimate, non-retaliatory reasons for transferring him. *Gullet v. Wilt*, No. 88-6797, 1989 WL 14614, at *2 (4th Cir. Feb. 21, 1989). More recently, again in an unpublished opinion, the Fourth Circuit applied *Constantine* in reversing a grant of summary judgment on an inmate's claim of First Amendment retaliation, where the inmate alleged that prison officials retaliated against him for filing a grievance regarding the handling of his mail by charging him with a disciplinary offense. *See Booker v. South Carolina Dep't of Corrections*, 583 F. App'x 43, 44 (4th Cir. 2014). *Booker* provides a strong signal that such a right now exists in the Fourth Circuit.

Other Circuits have long held that prison inmates have a First Amendment right to be free from retaliation for filing prison grievances. *See Santiago v. Blair*, 707 F.3d 984, 991 (8th Cir. 2013); *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010); *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008); *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002); *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996); *cf. Allah v. Seiverling*, 229 F.3d 220, 224–26 (3d Cir. 2000) (finding that filing a civil rights case in federal court against prison officials is protected activity under the First Amendment); *Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995) (same); *McDonald v. Hall*, 610 F.2d 16, 18 (1st Cir. 1979) (same).

Here, prior to the alleged retaliation in July 2014, Hendrick filed multiple ARPs against correctional officers alleging excessive force arising from a June 2013 incident, as well as an appeal from the dismissal of an ARP in June 2014. Filing an internal grievance regarding alleged excessive force falls squarely within the protection of the First Amendment. *See*

14

*Santiago*, 707 F.3d at 991 (finding that filing of a prison grievance alleging excessive force is protected by the First Amendment); *Hill*, 630 F.3d at 470–72 (finding that filing grievances for abuse by prison officials is protected by the First Amendment). Indeed, the Medical and State Defendants do not appear to challenge that Hendrick's filing of ARPs alleging excessive force were protected by the First Amendment.

### 2.    Retaliatory Action

For purposes of a First Amendment retaliation claim under § 1983, the retaliatory conduct need not itself violate a constitutional right. *Adams*, 40 F.3d at 75 ("[P]laintiffs must allege *either* that the retaliatory act was taken in response to the exercise of a constitutionally protected right *or* that the act itself violated such a right."); *Allah*, 229 F.3d at 224 ("Retaliation may be actionable, however, even when the retaliatory action does not involve a liberty interest."). Rather, retaliatory conduct is an actionable "adverse action" if it would likely deter "a person of ordinary firmness" from exercising First Amendment rights. *Constantine*, 433 F.3d at 500 (citations omitted). Retaliatory conduct need not actually have deterred the plaintiff from exercising First Amendment rights, though the plaintiff's actual response to that conduct provides some evidence of the tendency to chill First Amendment activity. *Id.* Weighing this evidence and determining whether a person of ordinary firmness would be deterred is usually a question best left to a jury. *See Santiago*, 707 F.3d at 992.

Here, Hendrick asserts that Defendants retaliated against him for filing ARPs alleging excessive force in the June 2013 incident by revoking his single cell privileges and forcibly moving him to a double cell. The Court has previously found that the move to a single cell did not violate Hendrick's constitutional rights, both because there is no constitutional right to a single cell, and because Hendrick has not shown that deprivation of a single cell constitutes

deliberate indifference to a serious medical need or to an excessive risk to his safety. *See Hendrick I*, 2015 WL 5766320, at *8–9. But that ruling does not foreclose a retaliation claim. Although a prisoner has no constitutional right to be housed in any particular facility or setting, an inmate "may nevertheless establish a claim under § 1983 if the decision to transfer him was made by reason of his exercise of constitutionally protected First Amendment freedoms." *McDonald*, 610 F.3d at 18.

In *McDonald*, the court held that an inmate had stated a retaliation claim by alleging that he was transferred for filing lawsuits against prison officials, even though he could otherwise be transferred for "no reason at all." *Id.* Other courts have reached the same conclusion. *See Hill*, 630 F.3d at 473 ("Even though a prisoner has no inherent constitutional right to avoid segregated housing or prison transfers, the [Bureau of Prisons] may not place the prisoner in segregated housing or transfer him to another prison as a means of retaliating against him for exercising his First Amendment rights."); *Allah*, 229 F.3d at 224 (holding that the plaintiff had stated a claim when he alleged that he was kept in administrative segregation in retaliation for filing suits against prison officials); *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999) (finding that transfer of an inmate to an area of the prison used to house mentally disturbed inmates in retaliation for assisting inmates in pursuing legal claims against prison officials could support a First Amendment retaliation claim).

Similarly, Hendrick's transfer to a double cell, like other prison transfers deemed sufficient to qualify as an adverse retaliatory action, constituted a move to a less favorable setting. Although a double cell is the norm at NBCI, Hendrick has documented numerous incidents of physical violence against inmates in double cells, including murders. Thus, even apart from Hendrick's clear subjective preference for a single cell, he has submitted evidence

16

sufficient for a reasonable jury to conclude that the loss of single cell status would deter a person of ordinary firmness from participating in the prison grievance process, particularly when coupled with the alleged violence used against him during the transfer.

### 3.   Causation

Hendrick must also provide sufficient evidence to establish a causal connection between his First Amendment activity and the alleged adverse action. *See Constantine*, 411 F.3d at 501. Such evidence can include direct evidence of retaliatory motive, *see Hill*, 630 F.3d at 475, or circumstantial evidence, such as evidence that the defendants were aware of the First Amendment activity and that the retaliation took place within some "temporary proximity" of that activity. *Constantine*, 411 F.3d at 501. Here, Hendrick has offered specific evidence of a retaliatory motivation for the move to a double cell. First, he asserts that on July 16, 2014, he was summoned to meet with Medical Director Beeman, Dr. Joubert, and Lt. Sawyers, and that in Dr. Joubert's presence, Beeman and Lt. Sawyers asked if Hendrick would be willing to "sign off" on his pending grievance relating to an alleged assault upon him by correctional officers in exchange for maintaining his single cell status. Hendrick Decl. ¶ 11. Although the grievance related to an incident from June 2013, the matter remained a live issue because Hendrick had re-filed his ARP relating to that incident on April 28, 2014 and had appealed the denial of his ARP on May 23, 2014. When Hendrick refused the offer and said he would continue to pursue his grievance, Dr. Joubert decided that same day that he no longer needed a single cell for medical reasons. Then, eight days later, when Sgt. Forney, CO Soltas, and CO Anderson physically moved Hendrick to a double cell, Sgt. Forney stated that Beeman had given the "green light" to take away Hendrick's single cell and put Hendrick "under attack." Hendrick Decl. ¶¶ 15–16. Sgt. Forney also told Hendrick that he "should not have filed grievances against [Forney's]

officers." *Id.* ¶ 15. According to Hendrick, the officers who moved him had punched him, choked him, and slammed his head into the side of the cell wall.

Defendants deny making these statements, assert that the decision to move Hendrick to a double cell was based on medical reasons only, and deny the use of excessive force. But on summary judgment, the Court must view the evidence in the light most favorable to Hendrick and draw all reasonable inferences in his favor. Not only does Sgt. Forney's statement provide direct evidence of a retaliatory motivation for the transfer, but a reasonable jury could find causation based on the fact that his single cell status was removed immediately after Hendrick rejected the offer by Beeman and Lt. Sawyers to allow Hendrick to stay in a single cell if he dropped his excessive force grievance. Although Defendants claim that the medical conference was previously scheduled, they have provided no explanation for why Hendrick's single cell status was subject to such an extensive review in July 2014, when that status had been renewed only five months earlier and was not scheduled to expire until February 2015. Under these circumstances, the Court finds a genuine issue of material fact on the issue of causation.

### 4. Legitimate Penological Interest

The Medical Defendants argue that First Amendment restrictions in the prison context are valid if they are reasonably related to legitimate penological concerns, and that transferring Hendrick to the double cell was a "medically appropriate decision" that served the legitimate goal of assuring his safety. Med. Defs.' Mot. at 12. The United States Court of Appeals for the Third Circuit has held that even if a prisoner asserting a First Amendment retaliation claim establishes the three elements of such a claim, prison officials "may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir. 2001).

The United States Court of Appeals for the Ninth Circuit has similarly held that "a successful retaliation claim requires a finding that the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution or was not tailored narrowly enough to achieve such goals." *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995).

To the extent that this rule is applicable in the Fourth Circuit, there remains a genuine issue of material of fact on this issue. Although Dr. Joubert has opined that there is no medical necessity for Hendrick to be in a single cell and that a double cell may enhance his safety because his cellmate could call for assistance in the event of a medical emergency, there are serious questions whether Defendants would have made the same decision absent the retaliation. As of July 16, 2014, Hendrick had been approved for a single cell, with one brief interruption, for over three years, dating back to February 2011. Significantly, on February 4, 2014, just five months before, Dr. Joubert's colleague, Dr. Ottey, approved Hendrick again for a single cell for a one-year period that was not scheduled to expire until February 4, 2015. Crucially, Defendants offer no explanation, such as an intervening event, for why they decided to revisit the issue before the end of this term. Because a reasonable jury could conclude that there was no legitimate penological interest that would have led to the transfer absent the retaliatory motivation, the Court finds that Hendrick has provided sufficient evidence to defeat the motions for summary judgment on his First Amendment retaliation claim.

### F.    Qualified Immunity

The State Defendants also assert that they are entitled to qualified immunity "given the status of the law." State Defs.' Mot. at 21. Government officials sued in their individual capacities, as the State Defendants are here, may invoke the protection of qualified immunity to bar a claim for civil damages under § 1983. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Qualified immunity shields government officials from liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Because of the latter interest, qualified immunity protects government officials from claims of constitutional violations that arise from "reasonable mistakes as to the legality of their actions." *Saucier v. Katz*, 533 U.S. 194, 206 (2001). It leaves unprotected only "the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The qualified immunity analysis can be separated into two inquiries: (1) whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that "the officer's conduct violated a constitutional right," and (2) whether the right at issue "was clearly established in the specific context of the case." *Merchant v. Bauer,* 677 F.3d 656, 662 (4th Cir. 2012).

### 1.    Violation of Constitutional Rights

As discussed above, Hendrick has stated two constitutional claims that withstand summary judgment: (1) an alleged violation of Hendrick's Eighth Amendment rights through the use of excessive force in moving Hendrick to a double cell; and (2) an alleged violation of Hendrick's First Amendment rights through retaliation against him for filing grievances regarding a different Eighth Amendment excessive force claim. The question remains, however, whether these rights were clearly established at the time they were allegedly violated.

## 2. Clearly Established Right

"A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This standard requires that "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Ashcroft v. al–Kidd*, 131 S. Ct. 2074, 2083 (2011)). To conclude that a right is clearly established, it is not necessary for a court to have previously considered the exact facts at issue, or that there be a case involving "materially similar" facts, but "in light of the pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer,* 536 U.S. 730, 739 (2002). Thus, "officials can still be on notice that their conduct violates established law even in novel factual circumstances," as long as the law gave the defendant official "fair warning" that the conduct was unconstitutional. *Id.* at 740–41. Furthermore, because the issue is whether an official should have known that his conduct violated a constitutional right, whether a right is "clearly established" for purposes of qualified immunity must be determined in light of the law at the time the contested action was taken. *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012).

Significantly, the Fourth Circuit has held that to determine whether a right was clearly established at the time of the alleged violation, courts "need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose." *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999). Thus, "[i]f a right is recognized in some other circuit, but not in this one, an official will ordinarily retain the immunity defense." *Id.* Moreover, unpublished opinions "cannot be considered in deciding

whether particular conduct violated clearly established law for purposes of adjudging entitlement to qualified immunity." *Hogan v. Carter*, 85 F.3d 1113, 1118 (4th Cir. 1996) (en banc).

The alleged Eighth Amendment violation for excessive force, if proven, would violate a clearly established right. In a long line of cases, the Supreme Court and the Fourth Circuit have repeatedly held that the Eighth Amendment is violated by "unnecessary and wanton infliction of pain," *Whitley*, 475 U.S. at 319–20, and "[w]hen prison officials maliciously and sadistically use force to cause harm," *Hudson*, 503 U.S. at 9. *See also Wilkins*, 559 U.S. at 38; *Williams*, 77 F.3d at 761; *Norman v. Taylor*, 25 F.3d 1259, 1262 (4th Cir. 1994). Therefore, summary judgment will not be granted on the Eighth Amendment excessive force claim based on qualified immunity.

As for the State Defendants' assertion of qualified immunity relating to Hendrick's retaliation claim, it appears to be firmly established that inmates have a First Amendment right to be free from retaliation for filing grievances or lawsuits against prison officials. The Eighth, Ninth, and Eleventh Circuits have explicitly held that such a right is clearly established. *See Santiago*, 707 F.3d at 991; *Schroeder*, 55 F.3d at 461; *Smith*, 532 F.3d at 1276. The First, Second, Third, Sixth, and District of Columbia Circuits have recognized such a right. *See Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010); *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002); *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996); *Allah v. Seiverling*, 229 F.3d 220, 224–26 (3d Cir. 2000); *McDonald v. Hall*, 610 F.2d 16, 18 (1st Cir. 1979). Some of these courts have even found such a right in the specific context of retaliation against an inmate for filing a grievance or lawsuit for excessive force, *see Santiago*, 707 F.3d at 991; *Hill*, 630 F.3d at 470-72, and when the retaliation takes the form of transferring the inmate to a

different, less desirable confinement setting, *see, e.g., McDonald*, 610 F.3d at 18; *Hill*, 630 F.3d at 473; *Allah*, 229 F.3d at 224; *Thaddeus-X*, 175 F.3d at 398.

The Fourth Circuit, however, has not so held in a published opinion. The Fourth Circuit has generally held that "[t]he First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *See Constantine*, 411 F.3d at 499 (citing *Suarez Corp. Indus.*, 202 F.3d at 685); *ACLU v. Wicomico County*, 999 F.2d 780, 785 (4th Cir. 1993). *Constantine*, however, did not involve the prison context. 411 F.3d at 499. *ACLU* did not address a prisoner's right to file a grievance without retaliation. 999 F.3d at 785. Because the Fourth Circuit has separately noted the distinct context of retaliation claims in a prison and counseled that they should be "regarded with skepticism," *Adams*, 40 F.3d at 74, it is difficult to conclude that *Constantine* and *ACLU* clearly gave fair warning to prison officials that retaliation against inmates for filing a prison grievance would violate a clearly established First Amendment right.

In three unpublished opinions, the Fourth Circuit has indicated that inmates have a First Amendment right to file a prison grievance. *See Booker*, 583 F. App'x at 44; *Wright*, 1991 WL 127597 at *1; *Gullet*, 1989 WL 14614 at *2. However, the Court cannot consider these unpublished opinions in deciding the existence of a clearly established right because they hold no precedential value. *See Hogan*, 85 F.3d at 1118. Moreover, the Fourth Circuit issued *Booker* on August 28, 2014, one month *after* the alleged retaliation against Hendrick on July 24, 2014. Therefore, even if *Booker* were a published opinion, it could not support a finding of a clearly established right at the time of the incident. *Messerschmidt*, 132 S. Ct. at 1245.

At the same time, the Fourth Circuit had stated in *Adams* that "there is no constitutional right to participate in grievance proceedings." *Adams*, 40 F.3d at 75. Although a close reading

of *Adams* indicates that its holding related to an Eighth Amendment claim rather than a First Amendment claim, that language, coupled with the lack of published opinion applying *Constantine* to the prison grievance context by the time of the alleged retaliation against Hendrick, prevents the Court from finding that the right was clearly established in the Fourth Circuit at that time. *See Venable v. Mathena*, No. 7:14cv00295, 2015 WL 5602670, at *8 n.8 (W.D. Va. Sept. 23, 2015) (finding that First Amendment right to be free from retaliation for asserting prison grievances is not clearly established in the Fourth Circuit); *See Delgado v. Ballard*, No. 2:09–1252, 2010 WL 3812358, at *3 (S.D.W.V. Sept. 24, 2010) (same).

Finally, although the Maryland Court of Special Appeals has suggested that there is a First Amendment right to file lawsuits or inmate grievance actions, *see Campbell v. Cushwa*, 758 A.2d 616, 627 (Md. Ct. Spec. App. 2000), the Maryland Court of Appeals has not so held.

The extensive body of law from across the nation leaves little doubt that retaliation against an inmate for filing a prison grievance violates the First Amendment.  But because Supreme Court, Fourth Circuit, or Maryland Court of Appeals precedent is needed to support a finding of a "clearly established right," *see Edwards*, 178 F.3d at 251, and no such precedent exists, the Court has no choice but to grant summary judgment in favor of the State Defendants on Hendrick's retaliation claim based on qualified immunity.

## CONCLUSION

For the foregoing reasons, Hendrick's Motion to Strike is DENIED, and the State Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, construed as a Motion for Summary Judgment, is GRANTED IN PART and DENIED IN PART.  The Motion is granted as to the Eighth Amendment claim relating to Hendrick's transfer to a double cell and the First Amendment retaliation claim, but the Motion is denied as to the Eighth

Amendment excessive force claim. The Medical Defendants' Motion for Summary Judgment on the First Amendment retaliation claim is DENIED. Hendrick is granted leave of 28 days to file a motion for appointment of counsel on the remaining claims. A separate Order shall issue.

Date: March 14, 2016

THEODORE D. CHUANG
United States District Judge